Filed 8/30/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| TAJIE MAJOR., | B260355 c/w B265671 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC473650) |
| v. | |
| R.J. REYNOLDS TOBACCO COMPANY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Amy D. Hogue, Judge.  Affirmed.

Jones Day, Steven N. Geise, Gregory G. Katsas and Charles R.A. Morse for Defendant and Appellant.

Brayton Purcell, Gilbert L. Purcell, Richard M. Grant and Jason M. Rose for Plaintiff and Appellant.

_____

William E. Major smoked two packs of cigarettes a day, on average, from 1961 to 1989. He was diagnosed with lung cancer in 1997, and died a year later. His wife, plaintiff Tajie Major, brought suit against several manufacturers of cigarettes Major had smoked, as well as manufacturers of asbestos to which he had been exposed, alleging that Major's smoking and his asbestos exposure caused his lung cancer and death.[1] All defendants but one settled, and plaintiff proceeded to trial against only Lorillard Tobacco Company, the manufacturer of Kent and Newport cigarettes.[2] After trial, the jury concluded that Lorillard's cigarettes were defectively designed, and that their design was a substantial factor in causing Major's death. In allocating responsibility for plaintiff's damages, the jury determined Major was 50 percent liable, Lorillard was 17 percent liable, other cigarette manufacturers were 33 percent liable, and asbestos exposure was not a substantial factor. After making appropriate allowances for comparative negligence and settlements, judgment was entered against Lorillard for an amount in excess of $3.75 million, plus costs and interest.

---

[1] We refer to the decedent as "Major," and his wife as "plaintiff" or "Mrs. Major." Some witnesses referred to Major as "Captain Major" reflecting his Navy rank.

[2] Lorillard has since been acquired by R.J. Reynolds Tobacco Company, which was one of the original defendants in this action. Although Reynolds has substituted in for Lorillard, and is a party to the appeal, we nonetheless refer to defendant/appellant as "Lorillard," because here we are concerned with Reynolds's liability for Lorillard's conduct, as opposed to Reynolds's liability for its own conduct (an issue resolved by pretrial settlement).

Lorillard appeals, arguing:  (1) federal law preempts liability on the theory pursued; (2) the trial court erred in refusing its proposed jury instruction that the sale of cigarettes is lawful; (3) the trial court erred in refusing to instruct the jury on "but-for" causation; (4) there is insufficient evidence that any defective design of Lorillard's cigarettes caused Major's death, in that Major would not have smoked any conceivable non-defective cigarette; and (5) the trial court erred in excluding evidence of Major's asbestos exposure, in the form of admissions in Mrs. Major's complaint, discovery responses, and claims against asbestos bankruptcy trusts.  Mrs. Major cross-appeals, arguing the court erred in calculating the prejudgment interest to which she was entitled.  We reject each of these arguments and affirm both the appeal and cross-appeal.

In doing so, we conclude, among other things, that: (1) Congress has expressed no intent to foreclose tort liability against cigarette manufacturers, even if liability may have some negative impact on the sale of cigarettes; and (2) but-for causation does not apply in a case of multiple causes, different combinations of which are sufficient to have caused the harm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Major's Smoking History*

There is no serious dispute that Major smoked heavily from 1961 until he quit in 1989.  What is not entirely clear is when he smoked Lorillard cigarettes, specifically Kents and Newports, as opposed to other brands.  Mrs. Major testified that she did not recall Major being exclusive to any one brand, although she remembered seeing him smoke Kents, Marlboros and Winstons. In one interrogatory answer, which Lorillard entered into evidence, Mrs. Major stated that Major smoked Winstons from

3

1961 to 1965; Marlboros from 1961 to 1984; and Kents from 1984 to 1989.  However, anecdotal evidence reflects Major's use of Lorillard cigarettes was not limited to the 1984-1989 period.  A Navy colleague testified that, in Spring 1973, Major was smoking Kents and Newports.  From that point until March 1975, he saw Major smoking Kents and (once) Marlboros.  One of Major's daughters testified that Major smoked Kents between 1979 and 1981.  In short, the jury appears to have concluded that Lorillard cigarettes accounted for approximately one-third of the harm Major suffered from cigarettes – a conclusion broadly supported by the evidence that he smoked Lorillard cigarettes, although not exclusively, during 12 years of his nearly 30-year smoking history.

Major quit smoking in 1989.  It was hard.  Later, when he encouraged his daughter to get her husband to quit, he told her that "[i]t's going to be hard to quit" and "[i]t's really tough to quit."  Before he stopped, Major had tried to quit perhaps four times; each attempt had been unsuccessful and he had resumed the habit.  Major's smoking history was in line with expert testimony that, due to nicotine addiction, only three percent of smokers' attempts to quit are successful and, on average, it takes seven or eight years for a smoker to stop smoking once he or she has chosen to do so.

2.    *Major's Cancer and Death*

In 1997, Major was diagnosed with small cell lung cancer, which the lung pathologist expert described as a "bad, bad type of cancer."  It metastasized to Major's lymph nodes, brain, liver and bone.  He was dead in a year.  There is no dispute that Major's lung cancer was caused, at least in part, by cigarette smoke carcinogens.  At trial, Lorillard questioned whether it was not

also caused by asbestos exposure.  On that, the medical evidence was, at best, inconclusive.  There was no evidence that Major had asbestosis or chest cavity scarring caused by asbestos.  While this did not exclude asbestos as a cause of Major's lung cancer, most people who have asbestos-caused lung cancer "usually" also present with evidence of a scar disease specific to asbestos.

3.    *Plaintiff's First Action*

In January 1999, plaintiff brought suit against Lorillard, two other cigarette manufacturers, and numerous asbestos manufacturers (the "First Action").  She alleged that Major's cancer was caused by exposure to both asbestos and cigarettes.

4.    *The Action is Dismissed and Refiled Six Years Later*

In 2005, the parties then remaining in the First Action agreed to a dismissal without prejudice (the "Dismissal Agreement").  At that time, several smoking-related cases were then pending in appellate courts, and the parties concluded that those cases might control, or at least affect, the disposition of this one.  The parties agreed that plaintiff could refile her action after the appellate cases had been resolved, and that, if she did, "[a]ll prior costs and C.C.P. § 998 offers will be tacked onto and applicable to, any refiled Action."  The Dismissal Agreement is at issue here solely in connection with plaintiff's cross-appeal.

The case was ultimately refiled in 2011.

5.    *The Operative Complaint*

The operative pleading in the refiled action is Mrs. Major's first amended complaint, filed in February 2012.  By this time, plaintiff had resolved her disputes with the asbestos manufacturers, and the only defendants were cigarette companies.  Nonetheless, the operative complaint still alleged

5

that Major's cancer had been caused by "the exposure to asbestos and tobacco."

Mrs. Major alleged two wrongful death causes of action: negligence and products liability. She alleged that defendants' cigarettes were defective when used as intended, and their risks outweighed their benefits.

6. *The Trial*

The other cigarette company defendants settled, and the case proceeded to jury trial against Lorillard, on the theory of design defect under the risk/benefit test, and negligent design which, in this case, was virtually identical to the risk/benefit theory. What was remarkable about the case was that Lorillard called no witnesses on its own behalf; the only testimony it elicited was through cross-examination of plaintiff's witnesses.

A. *Evidence That Lorillard's Cigarettes Were Defective*

On the issue of Lorillard's defective design, plaintiff elicited expert testimony to the following effect: (1) cigarettes are highly-engineered products, with design choices being made on every possible detail, including, for example, the length and diameter of the cigarette, the weight of the tobacco, the type of filter, the density of the coating over the inside of the filter, and the flavor additives; (2) cigarette "tar" -- the chemicals produced by smoking – includes 69 identifiable carcinogens; (3) at the time plaintiff was smoking Lorillard cigarettes, the state of the art was such that cigarette manufacturers could have made a no-tar cigarette, both as a traditional cigarette (which actually was marketed at the time) and as an aerosolized e-cigarette (which was not); and (4) nonetheless, Lorillard continued to sell Kent and Newport cigarettes, which contained substantial tar. Lorillard did not contest any of this evidence, but instead suggested that a no-tar

6

cigarette was not a commercially viable alternative design, in that although there were a few no-tar brands marketed, very few smokers found them satisfying. Plaintiff's expert agreed that no-tar cigarettes would not be used by the majority of smokers, as long as higher tar cigarettes remained on the market.

B. *Evidence That the Design of Lorillard's Cigarettes Was a Cause of Major's Cancer*

As to whether the design of Lorillard's cigarettes was a substantial factor in causing Major's cancer, it was not disputed that cigarette smoking itself played a substantial factor in causing the cancer. The issue at trial was whether the *design* of Lorillard's cigarettes was a substantial factor, as opposed to the simple fact that Major smoked. Plaintiff presented expert testimony that lung cancer is a total dose/response disease, meaning that "the more that you are exposed to a carcinogen . . . , the lot more likely you are going to develop a disease that is caused by it." One might infer that if the design of Lorillard's cigarettes resulted in an increased exposure to carcinogens (which they did, compared to a no-tar alternative), the design would also result in an increased risk of cancer. This was made explicit in expert testimony. Plaintiff's lung pathology expert agreed that if the design of Lorillard's cigarettes resulted in increased exposure to carcinogens, there is no doubt that those increased exposures "would be causal specifically in Captain Major's lung cancer." The expert testified that it is scientifically impossible to assign causal exposures to parts of an overall aggregate dose. The best science can do is say that "all of the carcinogens that he was exposed to contributed to cause his small cell lung cancer." The expert implicated every cigarette Major

smoked from birth to 1987 as a substantial factor in his lung cancer.

C.     *Evidence Pertaining to Asbestos*

One of Lorillard's theories of defense was that, even conceding its cigarettes contributed in some way to Major's cancer, the cancer could be attributed to Major's smoking of other cigarettes combined with his asbestos exposure. Expert testimony indicated that asbestos and cigarette smoke carcinogens work synergistically to create an increased risk of lung cancer over and above the risk caused by simply adding together the risks caused by the total exposures. That Major smoked other brands of cigarettes, for many years, is uncontroverted. It is also uncontroverted that he was exposed to asbestos. What was controverted was whether his asbestos exposure was a substantial factor in his development of lung cancer.

Plaintiff's counsel, in his opening statement, conceded probable asbestos exposure, stating, "there's no question that Captain Major, when we go through his career, was aboard ship and doing things where there was significant activity of asbestos products in his vicinity, and he probably had some exposure to it." But counsel did not concede causation from asbestos, stating, "the evidence will show you that [Major's cancer] was certainly caused by cigarettes and may have also been contributed to by asbestos exposure [that] he had."

Plaintiff's lung pathology expert testified that there was no evidence of asbestos-related lung scarring, which is usually seen when a lung cancer is caused by asbestos. He conceded, though, that he had been looking at a small tissue sample which was "probably not enough, really, to make an absolute conclusion."

He agreed that Major had been exposed to asbestos, and testified that Major's cancer might have involved both cigarettes and asbestos. In cross-examination based on Mrs. Major's interrogatory responses, the expert conceded that if the interrogatory responses were true, Major suffered significant exposure to asbestos and asbestos "was a cause" of Major's lung cancer. At one point he testified that Major's lung cancer "was caused by the combined effect of asbestos and the carcinogens in cigarette smoke." On redirect, the expert explained that, prior to trial, he did not have sufficient information regarding Major's asbestos exposure to reach opinions regarding asbestos. He agreed that if Major had been exposed to asbestos and cigarette smoke carcinogens, both contributed to his cancer. Other than the fact that Major had been exposed to asbestos, there was no medical evidence – such as test results or lung scarring – showing that Major was afflicted with an asbestos-related disease.

Plaintiff's expert pulmonologist testified similarly. It is not necessary to have asbestosis in order to have an asbestos-caused lung cancer, but it is "common" for them to present together. Major did not have radiologic evidence of an exposure to asbestos sufficient to cause a scar response. The pulmonologist could not say that asbestos contributed to Major's malignancy, nor could he exclude it as a cause. However, he conceded that he did not have a sufficient understanding of Major's work history to determine if asbestos had been involved.[3]

Prompted by the testimony of plaintiff's experts, Lorillard wanted to introduce evidence of Major's exposure to asbestos.

---

[3] As Lorillard called no witnesses, no defense expert testified that Major's lung cancer was caused in whole or in part by asbestos.

Specifically, it sought to introduce excerpts from Mrs. Major's complaint, Mrs. Major's admissions in interrogatories, and Mrs. Major's assertions in claims against asbestos bankruptcy trusts, which would show *both* Major's history of asbestos exposure *and* Mrs. Major's legal assertion that the asbestos exposure was a factor in causing Major's cancer. Mrs. Major objected, and the asbestos evidence which defendant was permitted to introduce was limited by the trial court's rulings and, in one case, by a stipulation by the parties. Lorillard challenges these rulings on appeal, and we will discuss them at length in the Discussion section of our opinion.

We describe here the evidence which Lorillard was permitted to introduce at trial. It included a lengthy discussion of Major's job history, including the many years he spent as a Naval officer. This specifically referenced asbestos exposure in several situations, as excerpted here: "Decedent was exposed to asbestos-containing materials installed on the [U.S.S.] England, including those installed prior to the time he served on board. . . . Decedent qualified as a surface warfare officer, which required him to regularly stand watch in the engine rooms. Decedent was exposed to asbestos-containing materials installed on the [U.S.S.] Fox prior to the time he served on board. . . ." The interrogatory answer, as read to the jury, ended with, "At all of the above sites, decedent worked with or around asbestos-containing materials . . . ." Finally, Lorillard read an interrogatory answer in which Mrs. Major stated that Major "suffered significant exposure to asbestos-containing products in the U.S. Navy. Plaintiff further responds that she does not have sufficient personal knowledge to identify and describe each and every exposure to asbestos decedent suffered throughout his lifetime."

7.      *The Verdict*

On a special verdict, the jury unanimously concluded that the design of Lorillard's cigarettes was a substantial factor causing harm to Major, and that the risks outweighed the benefits of their design. Major's negligence was also found to be a substantial factor, as were other cigarette manufacturers; asbestos exposure was not. Fault was allocated 50 percent to Major, 33 percent to the other cigarette manufacturers, and 17 percent to Lorillard. The jury calculated economic damages at $2,736,700, and non-economic damages at $15 million. No punitive damages had been sought.

8.      *The Judgment*

The court denied Lorillard's motions for a new trial and judgment notwithstanding the verdict. Reducing the damages for comparative negligence and giving credit for settlements with other tortfeasors, judgment was entered for plaintiff in the amount of $3,780,100.93, plus interest and costs.

9.      *Prejudgment Interest*

It is undisputed that, in connection with the First Action, plaintiff had served, and defendant had rejected, an offer to settle under Code of Civil Procedure section 998 for $199,999. It was also undisputed that, because plaintiff's result at trial was better than her rejected offer, she was entitled to prejudgment interest.

The parties further agreed that, due to the Dismissal Agreement, plaintiff was entitled to prejudgment interest accruing during: (1) the period between service of her offer to settle and dismissal of the First Action; and (2) the period between the filing of the second action and judgment in the second action. They disputed, however, whether plaintiff was also entitled to prejudgment interest during the period in

11

between, when no action was pending. The issue was briefed, and the trial court agreed with Lorillard that plaintiff was not entitled to prejudgment interest during the period that the Dismissal Agreement was in effect.

10.    *Cross-Appeals*

Lorillard timely appealed from the judgment; Mrs. Major timely appealed the denial of prejudgment interest during the period the Dismissal Agreement was in effect.

## *DISCUSSION*

1.    *Federal Law Does Not Preempt Plaintiff's Claim*

Lorillard's first argument on appeal is that liability in this case is federally preempted. The argument begins: Plaintiff prevailed on a theory that virtually all cigarettes sold in the United States – all except the handful of no-tar cigarettes which had a negligible market share – are defectively designed. Tort liability on this basis is the functional equivalent of a ban on all cigarettes. It continues: But Congress has concluded that cigarettes may, in fact, be sold in the United States. Thus, tort liability on the theory successfully pursued by plaintiff is contrary to the intent of Congress, and must therefore be preempted.[4]

---

[4]    We proceed to discuss whether the current state of federal law preempts state law tort liability for the design and sale of cigarettes. It is important to note, however, that we reject, for lack of evidence at trial, Lorillard's initial premise – that tort liability *in this case* is the functional equivalent of a ban on all cigarettes. The Kent and Newport cigarettes Major smoked were not no-tar cigarettes, nor were they low-tar cigarettes. Many other cigarettes existed with lower tar yields, and it is only speculation that the jury's conclusion that the Lorillard cigarettes

12

We start with some general observations about federal preemption.  " 'There is ordinarily a "strong presumption" against preemption.  [Citations.]  "Consideration of issues arising under the [s]upremacy [c]lause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.'  [Citation.]  Accordingly, ' "[t]he purpose of Congress is the ultimate touchstone" ' of pre-emption analysis.  [Citation.]" [Citation.]  However, when the state regulates in an area where there has been a history of significant federal presence the " 'assumption' of nonpre-emption is not triggered . . . ." [Citation.]'  [Citation.]"  (*Sturgeon v. Bratton* (2009) 174 Cal.App.4th 1407, 1422 (*Sturgeon*).)  While Congress has acted in the area of cigarette labeling and advertising, to the point of expressly preempting state laws to the contrary in those areas (*Altria Group, Inc. v. Good* (2008) 555 U.S. 70, 78-79 [state fraud liability not preempted]; *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 518-519 [express preemption clause of 1965 federal act "merely prohibited state and federal rulemaking bodies from mandating particular cautionary statements on cigarette labels [citation] or in cigarette advertisements [citation]" but does not encompass "common-law damages actions"]), Lorillard points to no "significant federal presence" (*Sturgeon, supra,* 174 Cal.App.4th at p. 1422) in terms of cigarette design and sale.  As such, the usual presumption of nonpreemption applies.

"Preemption of state law can be express or implied.  It is express when Congress positively enacts a preemption clause

---

Major smoked were defective is equivalent to a finding that all cigarettes are defective and must be removed from the market.

displacing state law; it is implied when courts infer a congressional intent to displace state law under one of three doctrines of 'implied preemption'—namely, 'field, conflict, or obstacle preemption.' [Citation.] 'Field preemption applies when federal regulation is comprehensive and leaves no room for state regulation'; '[c]onflict preemption is found when it is impossible to comply with both state and federal law simultaneously'; and '[o]bstacle preemption occurs when state law stands as an obstacle to the full accomplishment and execution of congressional objectives.' [Citation.]" (*Roberts v. United Healthcare Services, Inc.* (2016) 2 Cal.App.5th 132, 142; see also *Brown v. Mortensen* (2011) 51 Cal.4th 1052, 1059.)

Lorillard's argument is one of obstacle preemption. It is based on the premise that Congress intends to allow cigarettes to be sold, and that tort liability for the sale of cigarettes would at a minimum stand as an obstacle to the accomplishment of that goal. But Lorillard does not direct us to any specific federal statute to establish its premise that Congress does, in fact, intend that cigarettes be exempt from tort liability. Instead, as we see it, Lorillard hangs its argument primarily on language in a United States Supreme Court case that has nothing to do with tort liability, *Food and Drug Administration v. Brown & Williamson Tobacco Corp.* (2000) 529 U.S. 120 (*Brown & Williamson*).

In *Brown & Williamson*, the Supreme Court considered whether the Food and Drug Administration ("FDA") possessed jurisdiction to regulate tobacco products, on the theory that nicotine is a drug within the meaning of the Food, Drug, and Cosmetic Act ("FDCA"). (*Brown & Williamson, supra,* 529 U.S. at p. 125.) The court concluded that the FDA did not have such

14

jurisdiction. (*Id.* at p. 126.) The issue in *Brown & Williamson* was not one of federal preemption of state law, but one of an agency's (in this case, the FDA's) construction of a statute that it administers (the FDCA). The court's consideration of the issue began with whether Congress had spoken directly on the FDA's jurisdiction, and the court ultimately concluded that Congress had. (*Id.* at p. 133.) Specifically, the court found that, if cigarettes were regulated under the FDCA, the FDA would be required to remove them from the market. (*Id.* at pp. 135-136.) But when the court considered Congress's history of regulating cigarettes, the court concluded that a "ban of tobacco products by the FDA would . . . plainly contradict congressional policy." (*Id.* at p. 139.) The court believed that Congress had been aware of the health consequences of tobacco when it chose to regulate cigarette labeling and advertising while "stopp[ing] well short of ordering a ban." (*Id.* at p. 138.) It believed that, if the FDA enacted a ban, that would directly counter Congress's implied decision not to enact a federal ban itself. (*Id.* at pp. 137-139.)

Lorillard reasons that if an FDA ban on tobacco products would contradict congressional policy, tort liability that was the functional equivalent of a state law ban would *also* contradict congressional policy, and is therefore federally preempted. We have already rejected for lack of evidentiary support Lorillard's claim that tort liability in this case equates with a ban. Beyond that, Lorillard relies on certain language from *Brown & Williamson* stating that Congress's intent was that "cigarettes and smokeless tobacco will continue to be sold," without recognizing the implicit limitation on that language in light of *Brown & Williamson*'s limited inquiry into whether the FDA could impose a ban.

15

The flaw in Lorillard's argument is that Congress's intent that a federal agency created by Congress did not have the authority to impose a nationwide ban on cigarettes says little about whether a state could impose such a ban within its borders under the state's traditional police powers. That issue was not before the Supreme Court; nor do we have to decide it here. Standing alone, *Brown & Williamson*'s discussion of Congressional intent vis-à-vis the FDA does not overcome the presumption against preemption. And nothing in *Brown & Williamson* tells us about Congress's intent as to state restrictions on cigarettes.

Following *Brown & Williamson*, Congress enacted legislation specifically addressing the issue. In 2009, Congress superseded the holding of *Brown & Williamson* by in fact granting the FDA authority over tobacco products, including cigarettes. (21 U.S.C. § 387a(a) & (b).) In that statute, the Family Smoking Prevention and Tobacco Control Act, Congress specified that the FDA's authority did not include the authority to ban all cigarettes. (21 U.S.C. § 387g(d)(3).) At the same time, Congress specified that nothing in that subchapter (with an exception not relevant here) "shall be construed to limit the authority of a Federal agency (including the Armed Forces), a State or political subdivision of a State, or the government of an Indian tribe to enact, adopt, promulgate, and enforce any law, rule, regulation, or other measure with respect to tobacco products that is in addition to, or more stringent than, requirements established under this chapter, including a law, rule, regulation, or other measure relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products by individuals of any

16

age . . . ." (21 U.S.C. § 387p(a)(1).) Considered together, these statutes state that while Congress's intent is that the FDA not ban cigarettes entirely, Congress has made no such determination with respect to the states. (*U.S. Smokeless Tobacco Mfg. Co. LLC v. City of New York* (2013) 708 F.3d 428, 433 ["the preservation clause of [this section] expressly *preserves* localities' traditional power to adopt any 'measure relating to or prohibiting the sale' of tobacco products"].)

Lorillard responds that this statute does not "retroactively abrogate the Supreme Court's conclusion that, at least before 2009 [the year Congress granted FDA authority], Congress deliberately chose to foreclose the removal of tobacco products from the market." But there is no abrogation, because there was no such congressional intent. In *Brown & Williamson*, the Supreme Court concluded that Congress did not intend for *the FDA* to remove tobacco products from the market; it did not address the states' powers. The Family Smoking Prevention and Tobacco Control Act confirmed that the Supreme Court was correct in interpreting Congress's intent with respect to the FDA, but also confirmed that Congress did not have a similar intent with regard to the states.[5]

---

[5] Lorillard offers no other interpretation of this statutory language. Instead, Lorillard notes that an uncodified section of the same statute provided that it shall not be construed to "affect any action pending in Federal, State, or tribal court, or any agreement, consent decree, or contract of any kind." (Pub. L. No. 111-31 (June 22, 2009) 123 Stat. 1776, § 4(a)(2).) Lorillard interprets this provision to mean that no "rationale based on" the statute can have any effect on this case, as it is "a continuation of one that was pending" before the statute was enacted in 2009. Even if the provision somehow prevents a court from considering

17

Because we find no general federal preemption of state tort law that regulates the sale of cigarettes, Lorillard's argument fails. Other courts have agreed. Just this year, the Florida Supreme Court rejected similar preemption claims by cigarette manufacturers. (*R.J. Reynolds Tobacco Company v. Marotta* (2017) 214 So.3d 590 (*Marotta*).) In *Marotta*, the tobacco company defendant argued, just as Lorillard does here, that *Brown & Williamson* establishes that Congress intended the manufacture and sale of cigarettes to continue, and therefore preempts state law claims based on such manufacture and sale. (*Marotta,* at pp. 595-596.) The Florida court disagreed, concluding, as do we, that "while *Brown & Williamson* held that the FDA did not have the authority to regulate tobacco products, it said nothing about the states' power to do the same." (*Marotta,* at p. 598.) Considering Congress's history of tobacco regulation, the *Marotta* court concluded that while Congress expressly preempted state and local regulations pertaining to labeling and advertising cigarettes, "there is no indication that Congress had a 'clear and manifest purpose' to insulate the tobacco industry from state tort liability." (*Id.* at p. 600.) While *Marotta* did not have to consider the validity of a state ban on cigarettes, it said even if an

its expression of congressional intent, it is not applicable here because the statute was enacted well after the First Action was dismissed and before the current action was actually filed. There is no suggestion in the Dismissal Agreement that the law in effect at the time the First Action was filed would govern. Indeed, the intent of the Dismissal Agreement was to enable certain cases to wend their way through the appellate system, as their resolution might affect this action.

outright ban on cigarette sales was preempted, state tort law liability was preserved.[6]  (*Id.* at p. 601.)

Lorillard notes that several federal district courts have accepted its preemption argument.  (*Pooshs v. Philip Morris USA, Inc.* (N.D. Cal. 2012) 904 F.Supp.2d 1009, 1025-1026; appeal filed Mar. 10, 2016; *Johnson v. Brown & Williamson Tobacco Corp.* (D. Mass. 2004) 345 F.Supp.2d 16, 21; *Conley v. R.J. Reynolds Tobacco Co.* (N.D. Cal. 2002) 286 F.Supp.2d 1097, 1107.)  We find these authorities unpersuasive.  These cases uncritically accept the premise that *Brown & Williamson*

---

[6]  In oral argument, Lorillard suggested that *Marotta* was incorrectly decided because it failed to consider the effect of *Geier v. American Honda Motor Company, Inc.* (2000) 529 U.S. 861.  In *Geier*, the U.S. Supreme Court concluded that a claim for tort liability for the failure to equip a vehicle with airbags was preempted by a safety standard, promulgated pursuant to the National Traffic and Motor Vehicle Safety Act, which provided for a general phasing-in of airbags and specifically permitted other restraints to be used instead.  (*Id.* at pp. 864-865, 874-875, 879.)  The court concluded that the tort action was preempted, because it would have stood as an obstacle to the federal intent that multiple different types of restraints be used at that time and that mandatory air bag installation was to be deferred.  (*Id.* at p. 881.)  *Geier* does not undermine *Marotta*, or our conclusion, because it is based on a distinguishable federal standard.  *Geier* found preemption based on an actual federal safety standard that permitted different types of restraints to be used in motor vehicles.  Lorillard would analogize to a congressional intent that cigarettes be sold in the United States.  But, as we have explained, there is no such intent.  Lorillard points to no statutory enactment providing that cigarettes shall be sold; *Brown & Williamson* holds only that Congress did not intend that a federal agency could ban them.  Subsequent federal legislation reflects a very different Congressional intent.

19

confirmed an across-the-board congressional intent that cigarettes not be banned; in reaching this conclusion the courts did not appear to consider that *Brown & Williamson* addressed FDA action, not state action. We therefore decline to adopt these district court opinions. Moreover, in an en banc decision, the Eleventh Circuit decided that *Brown & Williamson* "does not address state sovereignty, and it does not consider the preemptive reach of federal legislation on tobacco."[7] (*Graham v. R.J. Reynolds Tobacco Company* (11th Cir. 2017) 857 F.3d 1169, 1190 (en banc).) As such, the traditional police powers of the states to regulate cigarette sales and impose tort liability on cigarette manufacturers remain. (*Id*. at p. 1191.)

2.      *Lorillard Was Not Entitled to an Instruction That Cigarettes Are Lawful*

Lorillard next argues, as a alternative to its preemption argument, that the trial court erred in rejecting its instruction on the legality of cigarette sales. Specifically, Lorillard requested that the jury be instructed: "I remind you that the manufacture and sale of cigarettes is a lawful activity. Therefore, you cannot find Lorillard Tobacco Company liable merely based on a finding

---

[7]      The en banc panel consisted of 10 judges. The 7-judge majority held that *Brown & Williamson* did not consider the preemptive reach on states of federal legislation of tobacco. An eighth judge concurred in "the majority opinion's decision that federal law does not preempt" jury findings of liability against cigarette manufacturers. (*Graham v. R.J. Reynolds Tobacco Company, supra,* 857 F.3d at p. 1191 (conc. & dis. opn. of Carnes, J.).) A ninth judge concluded that a due process error meant it was unnecessary to reach the preemption issue. (*Id*. at p. 1315 (dis. opn. of Wilson, J.).) Only one judge expressly found preemption. (*Id*. at p. 1194 (dis. opn. of Tjoflat, J.).)

that Lorillard's product caused injury, or solely because Lorillard manufactures, advertises, or sells cigarettes."

California law on the duty to instruct is clear: "A party is entitled to have the jury instructed on each viable legal theory supported by substantial evidence if the party requests a proper instruction. [Citation.]" (*Orichian v. BMW of North America, LLC* (2014) 226 Cal.App.4th 1322, 1333.) "A court may refuse a proposed instruction that is erroneous, misleading, or otherwise improper and ordinarily has no duty to modify a proposed instruction in a civil case. [Citations.] This general rule is inapplicable, however, if the inaccuracy is minor and easy to correct and the failure to do so would leave the jury inadequately instructed on an important issue. [Citations.]" (*Ibid.*)

Here, the instruction Lorillard sought was both unnecessary and not supported by the evidence. On appeal, Lorillard attempts to characterize this case as one in which it was held liable simply for selling cigarettes, in that plaintiff's design expert took the position that any cigarette which produced tar could have been more safely designed, given that no-tar designs were available. But the issue before the jury was whether the Kent and Newport cigarettes smoked by Major – the specific tar and nicotine yields of which were before the jury in written exhibits – were defective. That plaintiff's expert may have drawn the line beyond Lorillard's cigarettes does not mean that any brand of cigarettes other than those smoked by Major was actually at issue here. The jury did not find liability for all cigarettes. The issue was: under the design defect test, do the benefits of Lorillard's cigarettes – which delivered more tar than several competing labels – outweigh their risk?

21

We therefore conclude Lorillard was not entitled to the instruction it sought. But even if the trial court erred, the error would have been harmless. That the sale of cigarettes is lawful and not alone a basis of liability is an obvious fact known to every juror. Tort liability is frequently imposed for the sale of products lawful in the abstract; the issue is whether the particular product was defective and caused harm. The same analysis applies to cigarettes.

Our conclusion is partially supported by the history of California law on the liability of cigarette manufacturers. If this case had been presented during 1988 through 1997, under California law applicable then, Lorillard's jury instruction argument might have more traction. During those ten years, cigarettes were entitled to special treatment immunizing liability. No longer. Civil Code section 1714.45, subdivision (a)(1) provides a statutory immunity from product liability actions for common consumer products when the product is "inherently unsafe and the product is known to be unsafe by the ordinary consumer who consumes the product with the ordinary knowledge common to the community." Subdivision (a)(2) specifies certain products, such as alcohol, to which the immunity applies. For a ten-year period, from January 1, 1988, through December 31, 1997, the statute also applied to tobacco, but tobacco was then removed from the list. (*Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 832-834.) In repealing the immunity for tobacco, it was the "intention of the Legislature . . . to declare that there exists no statutory bar to tobacco-related personal injury, wrongful death, or other tort claims against tobacco manufacturers and their successors in interest by California smokers or others who have suffered or incurred

injuries, damages, or costs arising from the promotion, marketing, sale, or consumption of tobacco products." (Civ. Code, § 1714.45, subd. (f).) "Therefore, with respect to conduct falling *outside* the 10-year immunity period, the tobacco companies are not shielded from product liability lawsuits." (*Myers v. Philip Morris Companies, Inc., supra,* 28 Cal.4th at p. 832; see also *Naegele v. R.J. Reynolds Tobacco Co.* (2002) 28 Cal.4th 856, 860 ["The liability of tobacco companies based on their conduct outside the 10-year period is governed by general tort principles."].)

As tort liability for defectively designed cigarettes is governed by the same tort law principles which govern tort liability for any defectively designed product, Lorillard's proposed instruction regarding the lawfulness of cigarettes would have had no effect on this action.

3.    *The Court Did Not Err in Refusing to Instruct on But-For Causation*

Lorillard argues the court erred in refusing to instruct the jury on but-for causation. For us to properly address the issue, we must take a brief detour to the evolution of causation instructions in California.

A.    *Legal Background*

In 1991, the California Supreme Court considered two then-current BAJI instructions regarding causation. One, former BAJI No. 3.75, provided a but-for test. The second, BAJI No. 3.76, was a substantial factor test. In *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, the court concluded that the but-for instruction was poorly written and caused jury confusion. (*Id.* at pp. 1050-1052.) The Supreme Court disapproved of the but-for instruction and held the substantial factor instruction was a

23

better instruction. (*Id.* at pp. 1045, 1053.) In the course of its discussion, the court noted that, generally speaking, the substantial factor test subsumes the but-for test. (*Id.* at p. 1052.) But this general proposition is untrue when "two 'causes concur to bring about an event and either one of them operating alone could have been sufficient to cause the result.' " (*Id.* at p. 1049.) In such a case, *neither* cause can be considered a but-for cause of the injury, as the injury would have occurred without either one, but both causes are substantial factors in bringing about the injury. (*Ibid.*) In short, (1) in the "great majority of cases," the substantial factor test produces the same result as the but-for test, and (2) the substantial factor test also produces the right result in cases of independent causes, where the but-for test would lead to incorrect results. (*Id.* at pp. 1052-1053.) Although the court disapproved of the then-existing but-for instruction, it did not remove the concept of but-for causation from California law, and observed that nothing in the opinion should be read to discourage the jury instruction committee from drafting a new and proper but-for instruction. (*Id.* at p. 1054, fn. 10.)

Twelve years later, the court reaffirmed that there is still a place for but-for causation in the law, holding that a client cannot recover for attorney malpractice in a transactional setting unless the client can establish the harm would not have occurred without the malpractice. (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1235.) In the course of its discussion, the court reaffirmed that, generally, the substantial factor test subsumes the but-for test. (*Id.* at p. 1240.) It also reaffirmed that the but-for test is inappropriate in cases when two forces are actively operating and each is sufficient to bring about the harm. (*Ibid.*) The court recognized that this exceptional situation "has been given various

24

labels, including 'concurrent independent causes' [citation], 'combined force criteria' [citation], and 'multiple sufficient causes' [citation]." (*Ibid.*)

The current causation jury instruction is CACI No. 430. It provides, "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] [Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct.]" The instruction's Use Note explains that "[t]he 'but for' test of the last optional sentence does not apply to concurrent independent causes, which are multiple forces operating at the same time and independently, each of which would have been sufficient by itself to bring about the same harm. [Citations.] Accordingly, do not include the last sentence in a case involving concurrent independent causes."

Contemporaneous with these developments in but-for causation doctrine, another line of cases was considering a problem of proof arising in cases of asbestos exposure. If a plaintiff has developed an asbestos-related disease after having been exposed to multiple defendants' asbestos products, medical science was unable to determine which defendant's product included the specific fibers that caused the plaintiff's disease. (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 976 (*Rutherford*).) As a result of this barrier, the long latency-period of asbestos-related disease, and the occupational settings that often exposed workers to multiple forms and brands of asbestos, our Supreme Court concluded than an asbestos plaintiff need only prove "that exposure to the defendant's asbestos products was, in reasonable medical probability, a substantial factor in

25

causing or contributing to his risk of developing cancer." (*Id.* at pp. 957-958.)

In light of *Rutherford*, California adopted CACI No. 435, titled "Causation for Asbestos-Related Cancer Claims." It provides, "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It does not have to be the only cause of the harm. [¶] [*Name of plaintiff*] may prove that exposure to asbestos from [*name of defendant*]'s product was a substantial factor causing [his/her/[*name of decedent*]'s] illness by showing, through expert testimony, that there is a reasonable medical probability that the exposure was a substantial factor contributing to [his/her] risk of developing cancer."

Subsequent authority has extended *Rutherford* to cancer caused by long-term exposure to multiple different toxins. (*Bockrath v. Aldrich Chemical Co., Inc.* (1999) 21 Cal.4th 71, 77, 79.) While one case suggested that *Rutherford*'s rule "would appear appropriate" for injuries due to cigarette smoke, the appellate court ultimately concluded that it need not resolve the issue on the facts before it. (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 700-701 (*Whiteley*).)

B.      *Causation Instructions in This Case*

With this background, we now discuss the jury instruction issue as it arose in this case.

Pretrial, Mrs. Major argued for the *Rutherford* standard of causation (CACI No. 435). Lorillard wanted the usual substantial factor instruction, including the optional but-for language (CACI No. 430). The trial court initially determined that, in the absence of authority that *Rutherford* applied in a smoking case, it would not give the *Rutherford* instruction.

26

Therefore, the court would give CACI No. 430. The dispute then turned to whether the last bracketed line of the instruction, regarding but-for causation, also would be given. Plaintiff objected to that sentence.

Because the Use Note stated that the but-for sentence should not be given in cases of concurrent independent causes, the debate turned to whether this case involved concurrent independent causes, or some other type of multiple causes.[8] At this point, the court decided to defer ruling until after it heard the evidence, although it was, at that moment, "inclined" to instruct on but-for causation.

Near the close of the evidence, the court returned to the issue. By this time, the court's tentative view was that the jury should not be instructed on but-for causation, but it intended to further research the issue. After reviewing the law, particularly the *Whiteley* case, the court reconsidered whether to give the *Rutherford* instruction. The court stated, however, that even if it did not give *Rutherford*, it was not going to give the but-for sentence from CACI No. 430. The court was convinced that but-for causation did not apply to this case. Given the uncertainty as to whether *Rutherford* applied to a cigarette case, the court believed that giving CACI No. 430 without the but-for instruction

---

[8] The parties appeared to go off on a tangent on whether asbestos exposure and cigarette smoking were "dependent" or "independent." This was mistaken. The issue is not whether the causes were dependent or independent; "concurrent independent causes" is a term of art, used to refer to the situation of two forces each sufficient to bring about the harm. The parties could have just as easily considered whether the causes were "multiple sufficient causes," a term some courts have used. (See *Viner v. Sweet, supra,* 30 Cal.4th at p. 1240.)

was a fair resolution of the problem.[9]  The court ultimately followed this course, instructing in the language of CACI No. 430, without the optional but-for language.

C.    *Analysis*

Preliminarily we note, as did the *Whiteley* court, that it appears that there is no reason that *Rutherford* would apply in cases of asbestos exposure and multiple toxic substance exposure, but not exposure to carcinogens in cigarettes.  As the issue is not before us, we go no further, but await the proper case raising and fully briefing the issue.

Because the trial court in this case did not give the *Rutherford* instruction, the only issue raised by this appeal is whether the court erred in declining to give the but-for instruction.  The law is clear that but-for and substantial factor tests frequently lead to the same result.  The law is also clear they may produce different results in cases of concurrent independent causes and that, in such cases, substantial factor leads to the correct result; but-for does not.

Here, the parties' argument on whether the but-for instruction should be given focused on whether this was a case of

---

[9]    The court also agreed to give CACI No. 431, which provides, "A person's negligence may combine with another factor to cause harm. If you find that [*name of defendant*]'s negligence was a substantial factor in causing [*name of plaintiff*]'s harm, then [*name of defendant*] is responsible for the harm. [*Name of defendant*] cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing [*name of plaintiff*]'s harm."  On appeal, Lorillard argues that the court's use of CACI No. 431 compounded its error in refusing to give the but-for language of CACI No. 430, but does not assert that giving CACI No. 431 was itself error.

28

concurrent independent causes. "Concurrent independent causes" are, as discussed above, *two* causes which concur to bring about an event when either one of them operating alone could have been sufficient to cause the result. We believe the issue raised by this case, although not specifically phrased in this manner, is how to deal with a case of *more than two* concurrent causes, when various combinations of the causes – although perhaps not any individual cause – would have been sufficient to cause the harm. Or, putting it more concretely, suppose there were three equal causes acting on Major's lungs: Lorillard's cigarettes, R.J. Reynolds's cigarettes, and Philip Morris's cigarettes. Suppose that each was only 33 1/3 percent responsible, and, acting alone, would not have been sufficient to cause Major's cancer; but any two acting together would have been 66 2/3 percent responsible, and likely would have caused the cancer.[10] No individual cigarette manufacturer's liability would satisfy the but-for test, as Major would have developed cancer based on the other two alone; but no cigarette manufacturer would satisfy the independent concurrent cause test, because no individual manufacturer *alone* caused the cancer. In short, when there are three causes working together, any two of which would alone cause the harm, all three can escape liability via the but-for test.

This precise scenario is addressed in the Restatement Third of Torts: Liability for Physical and Emotional Harm,

---

[10]   This may, in fact, have been the jury's thinking in this case. When subtracting out the 50 percent comparative negligence allotted to Major for choosing to smoke the cigarettes, the jury allocated approximately one-third of the remaining negligence to Lorillard, and two-thirds of the remaining negligence to other cigarette manufacturers (of which only two were sued).

section 27, comment f. Section 27 addresses the exception to but-for causation for "Multiple Sufficient Causes," which is another term for concurrent independent causes. (*Viner v. Sweet, supra,* 30 Cal.4th at p. 1240.) The section provides, "If multiple acts occur, each of which . . . alone would have been a factual cause of the physical harm at the same time in the absence of the other act(s), each act is regarded as a factual cause of the harm." Comment f explains, "In some cases, tortious conduct by one actor is insufficient, even with other background causes, to cause the plaintiff's harm. Nevertheless, when combined with conduct by other persons, the conduct overdetermines the harm, i.e., is more than sufficient to cause the harm." The comment provides, "The fact that an actor's conduct requires other conduct to be sufficient to cause another's harm does not obviate the applicability of this Section. [Citation.] Moreover, the fact that the other person's conduct is sufficient to cause the harm does not prevent the actor's conduct from being a factual cause of harm pursuant to this Section, if the actor's conduct is necessary to at least one causal set." The comment includes Illustration 3: "Able, Baker, and Charlie, acting independently but simultaneously, each negligently lean on Paul's car, which is parked at a scenic overlook at the edge of a mountain. Their combined force results in the car rolling over the edge of a diminutive curbstone and plummeting down the mountain to its destruction. The force exerted by each of Able, Baker, and Charlie would have been insufficient to propel Paul's car past the curbstone, but the combined force of any two of them is sufficient. Able, Baker, and Charlie are each a factual cause of the destruction of Paul's car." The but-for test simply does not govern when it would exclude a

30

substantial cause merely due to the fact that other causes *acting together* are alone sufficient to cause the harm.

We believe this analysis is correct, and, in fact, necessary. Without this gloss on the concurrent independent cause rule, each of three equally liable tortfeasors can escape liability on the basis that they are neither but-for causes nor concurrent independent causes – a wholly unjust result. Yet this is exactly the result Lorillard seeks – it would use the but-for rule to avoid liability because the combined effects of Philip Morris's cigarettes and R.J. Reynolds's cigarettes were likely sufficient to cause Major's death alone; despite the fact that Lorillard's cigarettes, combined with either Philip Morris's or R.J. Reynolds's cigarettes, were likely also sufficient. We therefore conclude that multiple sufficient causes exist not only when there are two causes each of which is sufficient to cause the harm, but also when there are more than two causes, partial combinations of which are sufficient to cause the harm. As such, the trial court did not err in refusing to instruct the jury with the but-for test.

4.      *There Was Sufficient Evidence the Defective Cigarette Design Was a Substantial Factor in Causing Major's Cancer*

Lorillard's next argument is that there is insufficient evidence that its defective cigarette design was a substantial factor in causing Major's lung cancer. Lorillard does not question the medical evidence; plaintiff's expert specifically testified that if the design of Lorillard's cigarettes resulted in increased exposure to carcinogens, those increased exposures were a factor in causing Major's lung cancer. Instead, Lorillard argues that plaintiff had to introduce evidence that if Lorillard's cigarettes had been no-tar

cigarettes, Major would have smoked them (or not smoked at all). We believe Lorillard's argument is legally erroneous.

Lorillard relies exclusively on *Whiteley, supra*, 117 Cal.App.4th 635. In that case, the plaintiff argued that his wife's cancer had been caused by the defendant's cigarettes, which were defective due to their high levels of nicotine. (*Id.* at p. 696.) On the cigarette manufacturer's appeal from a substantial jury verdict, the cigarette manufacturer argued that there was insufficient evidence of causation. The Court of Appeal agreed. (*Id.* at p. 702.) The court reasoned that there was no evidence that, if the defendant had lowered the nicotine in its cigarettes, the decedent would have smoked them, smoked less, or quit smoking. Any such conclusion would have been speculative, and contrary to the evidence at trial, which showed that when the decedent had switched from unfiltered to filtered cigarettes, her smoking increased. (*Ibid.*)

We believe the *Whiteley* court was mistaken, to the extent it considered this evidence in terms of the plaintiff's failure of proof of causation, as opposed to the defendant's proof of comparative fault. Prior to the California Supreme Court's decision in *Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, a plaintiff's contributory negligence did not constitute a defense to an action in strict products liability, but the plaintiff's assumption of risk was a complete defense. (*Id.* at p. 733.) In *Daly*, the court concluded that assumption of risk should in fact be considered as a form of comparative fault, which applies to strict liability. (*Id.* at pp. 736-738.) The argument that a defendant who designed and marketed a defective cigarette should not be liable because the plaintiff's decedent would have smoked other manufacturers' defective cigarettes is a form of

32

assumption of risk.  It is therefore to be adjudicated as part of the affirmative defense of comparative fault.

We observe that one of the federal cases on which *Whiteley* relied was *Boerner v. Brown & Williamson Tobacco Co.* (E.D. Ark. 2000) 121 F.Supp.2d 1252, affirmed in part and reversed in part (8th Cir. 2001) 260 F.3d 837.[11]  In *Boerner*, the district court granted summary judgment to the defendant.  In its analysis, the court stated that plaintiff suffered from a failure of proof on its design defect claim, in that "there is no evidence from which a jury could reasonably infer that [the plaintiff's decedent] would have used any of the safer designs and thereby lessened the chances of contracting cancer.  [The decedent] has testified that she . . . avoided filtered cigarettes because their low nicotine content did not satisfy her.  This failure of proof entitles defendant to summary judgment on the defective design claim." (*Boerner, supra,* 121 F.Supp.2d at p. 1255.)  On appeal, the Eighth Circuit reversed, stating, "In reaching this conclusion, we have considered the district court's conclusion that [the decedent] would not have used a safer alternative product because she disliked filtered cigarettes, and find it to be beside the point.  Under Arkansas law, contributory negligence is no bar to recovery under a strict liability theory." (*Boerner v. Brown & Williamson Tobacco Corp.* (8th Cir. 2001) 260 F.3d 837, 848.)  We read the quoted language as the Eighth Circuit's recognition that whether the decedent would have smoked safer cigarettes is a

---

[11]     While *Whiteley* cited to the district court's opinion in *Boerner*, it did not discuss the Eighth Circuit's opinion reversing the district court, even though the Eighth Circuit's opinion in *Boerner* predated *Whiteley*.

33

component of the decedent's own negligence – an issue which, in California, is resolved under comparative fault principles.

Here, the jury found that Major himself was 50 percent comparatively at fault, presumably based on Lorillard's argument that he did not choose to quit smoking earlier and did not choose to smoke available no-tar cigarettes. The jury concluded that the cigarette manufacturers (taken together) and Major had been equally responsible for his lung cancer – the manufacturers for selling the defective cigarettes and Major for smoking them. Both are but-for causes of the cancer – had the cigarettes not been made or had Major not smoked them, the cancer would not have occurred. The cigarette manufacturers cannot transform the fact that Major's choice to smoke their defective cigarettes was a but-for cause into an argument that their defectively designed cigarettes were not a cause at all.

We also find persuasive Mrs. Major's argument that, if we are truly to consider a hypothetical world in which Lorillard made only safe cigarettes, before we speculate as to what Major would have done, we would have to also assume that Lorillard informed the public that its prior cigarettes (and all other tar cigarettes) were unsafe. To the extent this sort of hypothetical inquiry is too speculative to support any reasonable conclusion, it simply confirms our conclusion that Major's decision to smoke Lorillard's defective cigarettes goes to the issue of his comparative negligence, and is not something plaintiff must address as part of her causation case-in-chief.

5.  *The Court Did Not Prejudicially Err in Excluding Evidence of Asbestos Exposure and Causation*

Although it was undisputed that Major had been exposed to asbestos, the jury concluded that asbestos exposure was not a

substantial factor in causing his cancer – apparently having been persuaded by the medical evidence that showed Major had not developed other asbestos-related disease.  On appeal, Lorillard argues that the jury found no asbestos causation because the trial court prejudicially erred in excluding its evidence of asbestos exposure and causation.

We review the trial court's ruling on the admissibility of evidence for abuse of discretion.  (*Zhou v. Unisource Worldwide, Inc.* (2007) 157 Cal.App.4th 1471, 1476.)  A court's error in excluding evidence is grounds for reversal only if the appellant demonstrates a miscarriage of justice, that is, that a different result would have been probable had the error not occurred.  (*Id.* at p. 1480.)

The excluded evidence falls into three categories: (1) allegations in the complaint; (2) admissions in interrogatories; and (3) assertions in asbestos bankruptcy claim forms.

A.    *Allegations of the Complaint*

On appeal, Lorillard contends the trial court erred in preventing it from introducing into evidence three particular allegations from Mrs. Major's complaint:  (a) that asbestos acted synergistically with the cigarette smoke; (b) that a person exposed to asbestos fibers and cigarette smoke would be at a much greater risk for lung cancer than if he had been exposed to either one alone; and (c) that Major's cancer was caused by his exposure to both asbestos and tobacco.  Lorillard argues these admissions should have been admissible at least for impeachment if not as substantive evidence.

Procedurally, the issue was first raised in a motion in limine, by which plaintiff sought to preclude Lorillard from referring to the caption of the complaint, or any other allegations

of the complaint which would indicate Mrs. Major had sued additional defendants who are no longer in the case. Lorillard and the other tobacco defendants in the case responded that the allegations in Mrs. Major's complaint are admissible as either evidentiary admissions or prior inconsistent statements. They argued, "[T]o the extent Plaintiff now claims that tobacco defendants are solely liable for Decedent's death, Plaintiff's allegations concerning asbestos nonparties, which are the same in both her previously dismissed . . . complaint and her operative Complaint, may be offered as evidentiary admissions or for impeachment." Plaintiff replied that the tobacco defendants' premise was incorrect; she explained that she was *not* asserting that asbestos played no causal role in Major's lung cancer. She had "not made any inconsistent statements and freely acknowledges that asbestos was a cause of decedent's lung cancer."

At the hearing on the motion in limine, the court stated, "Nobody will be reading from any complaints in the case. That's for sure. Those are lawyer words. So I would grant." The court reasoned that allegations in the unverified complaint relating to causation were legal arguments of counsel, not factual assertions of plaintiff herself.

Lorillard did not raise the issue during trial. It made no attempt to impeach the testimony of Mrs. Major with allegations from her complaint. In fact, Mrs. Major did not testify as to her belief regarding whether asbestos played a causal role in Major's cancer; there was therefore nothing to impeach.

We question whether Lorillard obtained a final ruling on the admissibility of the three precise complaint excerpts it now argues were improperly excluded. Although the court made the

36

broad statement that "[n]obody will be reading from any complaints in the case," Lorillard did not draw the court's attention to the three specific allegations nor present at trial its argument for their admissibility. Moreover, the court made its ruling based on plaintiff's counsel's representation that plaintiff "freely acknowledges that asbestos was a cause of decedent's lung cancer." Once plaintiff's counsel had backed off from this somewhat in his opening statement, by saying that Major's cancer was caused by cigarettes "and may have also been contributed to by asbestos," Lorillard did not seek to reopen the issue.

In any event, even if Lorillard obtained a final ruling on admissibility, and even if the trial court erred in excluding the excerpts, we conclude any error was not prejudicial. The first excerpt was that asbestos acted synergistically with cigarette smoke. The second was that a person exposed to asbestos and cigarette smoke would be at a much greater risk for lung cancer than if he had been exposed to asbestos or cigarettes alone. Both of these points were not controverted at trial, and in fact testified to by plaintiff's lung pathology expert, Dr. Samuel Hammar. The third excerpt was plaintiff's allegation that Major's cancer was caused by both asbestos and cigarette exposure. While the causal role played by asbestos was disputed at trial, it was disputed because of medical evidence. It was clear that Major had been exposed to some amount of asbestos; but it was also clear that he had not suffered asbestos lung scarring, which is usually present when a lung cancer is caused by asbestos. Faced with this potential contradiction, Dr. Hammar testified that he would infer asbestos causation based on the significant asbestos exposure. Apparently the jury was not persuaded. That plaintiff herself

37

made the same inference in her complaint is even less convincing than the expert's testimony, causing us to conclude that the exclusion of the evidence was not prejudicial.[12]

B.    *Interrogatory Answers*

We need not discuss at length the interrogatory answers Lorillard sought to introduce, the arguments for and against admission, and the court's rulings.  On appeal, defendant argues that the court erred in its ruling with respect to one interrogatory answer only, a lengthy response given by Mrs. Major explaining the nature and extent of Major's exposure to asbestos.  At trial, however, the parties reached an agreement with respect to that precise interrogatory:  Lorillard could read a specified portion of the answer and, in light of the agreement, Lorillard agreed to "withdraw the proffer of the remainder of that interrogatory response" so there would be no issue on appeal.

Nonetheless, Lorillard argues now that excluding the remainder of Mrs. Major's answer was error.  When plaintiff argued waiver in her respondent's brief, Lorillard responded with the somewhat remarkable argument that plaintiff waived the right to rely on waiver – by failing to raise the waiver argument when Lorillard complained of the exclusion of the interrogatory answer in its motion for new trial.  The authority on which Lorillard relies for this proposition, *Federal Insurance Company v. Superior Court* (1998) 60 Cal.App.4th 1370, 1375, does not support it.  That case holds only that when a party argues on

---

[12]    Nor is this "one of those relatively rare cases where a party can be bound by a judicial admission made in an unverified complaint."  (*Womack v. Lovell* (2015) 237 Cal.App.4th 772, 776.)  Here, Lorillard was not misled by the so-called admission to think the issue of the extent of asbestos involvement in causation was not disputed at trial.  The issue was, in fact, fully litigated.

appeal that its opponent waived the right to arbitrate by seeking to litigate in court, the party asserting waiver must have first raised the issue before the trial court. (*Id.* at p. 1375.) That is simply an application of the general proposition that an argument must be pursued at trial before it can be raised on appeal. Here, in open court, Lorillard withdrew its proffer of the remainder of the interrogatory answer and waived its right to pursue its admissibility on appeal; that withdrawal and waiver is not undone by Mrs. Major's failure to mention the point in opposition to Lorillard's new trial motion.

      C.    *Bankruptcy Trust Claim Forms*

Many asbestos manufacturers have declared bankruptcy. (See Snyder, Todd R. & Siemer, Deanne C. (2005) 13 Am.Bankr. Inst. L. Rev. 801, Asbestos Pre-Packaged Bankruptcies: Apply The Brakes Carefully And Retain Flexibility For Debtors.) Mrs. Major initiated claims for Major's death against some asbestos bankruptcy trusts. Lorillard argues that it was error to exclude certain excerpts from Mrs. Major's claim forms submitted to those trusts. Mrs. Major responds, in part, that Lorillard has failed to identify the excerpts it sought to introduce – having presented only the unredacted stack of Mrs. Major's bankruptcy trust claim forms on appeal – and thereby provided an inadequate record for appellate review. Lorillard replies that the excerpts it "contends should have been admitted are clear from the face of the [unredacted documents] and thus easily identified." We review the unredacted documents with the understanding that it is not at all clear which excerpts Lorillard sought to introduce, and without knowing, if the excerpts had been admitted, which other portions the court would have allowed plaintiff to introduce. (Evid. Code, § 356 [where part of

an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party.].)

The issue was first raised in a motion in limine, by which Mrs. Major sought to exclude all references to all asbestos bankruptcy trust claim forms she submitted. Lorillard responded that, at the very least, some of the factual information in the claim forms would be admissible. Specifically, Lorillard argued that it "should be able to cross-examine [plaintiff's expert witnesses] at trial with documents demonstrating that not only was decedent exposed to asbestos, plaintiff believed that his lung cancer was caused by this exposure . . . ." At the hearing on the motion, the court tentatively decided to exclude the evidence of plaintiff's belief as to causation, on the grounds that whatever Mrs. Major *believed* to be the cause was not relevant. However, it tentatively denied the motion with respect to factual statements in the forms regarding Major's asbestos exposure. The court directed defendant to "give the court and opposing counsel a heads-up" before attempting to use any particular bankruptcy trust claim forms in cross-examination, so that any specific objection could be addressed.

Lorillard did not attempt to cross-examine any of plaintiff's witnesses with the bankruptcy trust claim forms. Lorillard did not return to the issue of bankruptcy trust claim forms at all until after plaintiff had rested. After reading some of Mrs. Major's interrogatory answers to the jury, Lorillard sought to admit into evidence excerpts from the bankruptcy trust claim forms. The trial court conceded that it had previously ruled that the factual allegations in the forms were relevant, but noted that Lorillard had failed to lay a foundation for their admissibility by

40

establishing that Mrs. Major saw and signed the forms. More than that, the court stated the evidence was cumulative, unless there were different factual statements in the bankruptcy trust claim forms than those made in the interrogatory answers already admitted. Plaintiff's counsel represented that Lorillard had not identified anything different and plaintiff's counsel believed that everything in the redacted exhibit was already in evidence. Lorillard's counsel said nothing. The court then ruled that the exhibit was cumulative.

On appeal, Lorillard argues that the excerpts it sought to admit were not cumulative. It states, "The claim forms contained detailed information about the dates of exposure, the places of exposure, and the activities that gave rise to the exposure. None of this factual information was introduced in another form at trial." This argument is made with no citation to the record, and without identification of the specific information Lorillard sought to introduce. It is only in its reply brief that Lorillard for the first time purports to identify specific information in the claim forms which was not otherwise introduced at trial.

We have reviewed the unredacted exhibit and conclude that, on the whole, the claim forms paint a very different picture than Lorillard asserts. The forms are, in fact, standard forms, which are to be filled out by the claimant. One of the questions asked on the form is "Was [the] death asbestos related?" While plaintiff answered "yes" on some of the forms, she left the question blank on several others.[13] Many of the forms also fail to answer the question regarding Major's asbestos exposure. Those

_____

[13]    One claim form includes a "Questions-Problems" page that says, "No meds stating LC [presumably: lung cancer] caused by asb. Expo" and indicates the claim was withdrawn.

41

that discuss asbestos do so with little detail, stating, for example, "Shipyard workers doing construction, overhaul and repair." Another states that Major "[o]versaw operation of engine rooms and inspected piping systems & boilers."

Other than specifically identifying the manufacturers of asbestos to which Major was exposed – a fact which has no relevance to causation – Lorillard has not identified any fact regarding Major's asbestos exposure which appears in these claim forms and was not otherwise already in evidence. As such, on this record, the court did not abuse its discretion in finding the excerpts cumulative.

To the extent Lorillard also argues the court erred in not admitting the claim forms' assertions that Major's death was asbestos-related, we conclude – as we did with respect to identical allegations in the complaint – that any error was not prejudicial. Particularly given that Mrs. Major did not assert the death was asbestos-related across all of the claim forms, and that any such assertion was only Mrs. Major's lay opinion, the admission of these assertions would have been of minimal significance in light of Mrs. Major's lung pathology expert's inference of asbestos causation, an inference which the jury rejected.

6.    *Plaintiff's Cross-Appeal:  The Court Did Not Err in Refusing to Award Prejudgment Interest For the Time the Dismissal Agreement Was in Effect*

In her cross-appeal, Mrs. Major contends the court erred by denying her prejudgment interest for the period the Dismissal Agreement was in effect.

Mrs. Major claimed a right to prejudgment interest under Civil Code section 3291. That provision states, in pertinent part,

"If the plaintiff makes an offer pursuant to Section 998 of the Code of Civil Procedure which the defendant does not accept prior to trial or within 30 days, whichever occurs first, and the plaintiff obtains a more favorable judgment, the judgment shall bear interest at the legal rate of 10 percent per annum calculated from the date of the plaintiff's first offer pursuant to Section 998 of the Code of Civil Procedure which is exceeded by the judgment, and interest shall accrue until the satisfaction of judgment."

Mrs. Major made no section 998 offer in the actual case that prompted this appeal – the second case. She did make an offer during the First Action. The only way in which the offer she made in the First Action could justify any award of prejudgment interest in this case is by the terms of the Dismissal Agreement, by which the parties agreed, among other things, that "[a]ll prior . . . [Code of Civil Procedure section] 998 offers will be tacked onto and applicable to, any refiled Action." Because of this language, the plaintiff's section 998 offer from the First Action became applicable to the second, and justified an award of prejudgment interest.

The question then becomes what is the period when pretrial interest legally accrued. Interpreting the language of the Dismissal Agreement, the trial court awarded interest accruing during the First Action and during the current action, but not for the period in which the Dismissal Agreement was in effect. On appeal, plaintiff challenges this ruling, contending the terms of the Dismissal Agreement unambiguously provided for prejudgment interest to accrue during the period of the Dismissal Agreement. In the alternative, plaintiff relies on extrinsic evidence, in the form of the declaration of her attorney involved

43

in negotiating the Dismissal Agreement, as to his understanding of the intent of the parties.

"The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code, § 1638.) " '[A] contract must be interpreted so as to give effect to the mutual intention of the parties, and the whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.' [Citation.]" (*Gray1 CPB, LLC v. Kolokotronis* (2011) 202 Cal.App.4th 480, 486-487.)

Here, we consider two relevant provisions of the Dismissal Agreement. First, the agreement states its purpose is to "comprehensively freeze the rights and remedies available to the parties as presently contained in the Action at the point of dismissal, as permitted by law." Second, the parties included a specific provision as to costs and section 998 offers, which provided, "If plaintiff refiles the Action, all recoverable costs associated with the Action carry over to the refiled Action and can be thereafter claimed by a prevailing party subject to a motion for costs subsequent to a judgment. All prior costs and [Code of Civil Procedure section] 998 offers will be tacked onto and applicable to, any refiled Action."

There is only one way to interpret this unambiguous language. The agreement intended to "comprehensively freeze the rights and remedies . . . at the point of dismissal." This does not allow for the continued accrual of prejudgment interest – a type of remedy – while the action remained dismissed. (See Civ. Code, § 3291 [under which plaintiff sought prejudgment interest in this case], found in Article 2 "Interest as Damages" of Chapter 1 "Damages in General" of Title 2 "Compensatory Relief" of

44

Division 4 "General Provisions" of the Civil Code.)  That remedy, among others, was frozen.  The specific provision relating to costs and section 998 offers is in agreement.  Prior costs and section 998 offers are to be "tacked onto" the refiled action; the costs do not continue to accrue, and the offers are not outstanding until the action is refiled.  The trial court did not err in refusing to award prejudgment interest during the period of the Dismissal Agreement.

### *DISPOSITION*

The judgment is affirmed in all respects.  Plaintiff is to recover her costs on appeal.

RUBIN, ACTING P. J.

WE CONCUR:

FLIER, J.

SORTINO, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

45